IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| | ) | **SENTENCING MEMORANDUM** |
| | ) | |
| vs. | ) | |
| | ) | |
| | ) | Docket No.: 3:19 CR 0041-MOC |
| MAURICE BURRIS, | ) | |
| Defendant. | ) | |

*INTRODUCTION*

Magistrate Judge David Keesler acknowledged the dichotomy within Maurice Burris on April 30, 2019, when he remarked that Mr. Burris is a man whose life and actions have straddled two extremes after listening to the recitations from both the government and defense counsel at Mr. Burris' release hearing. Judge Keesler's observation was a keen one, but one that begs the question how could the man who sponsors charity bicycle giveaways for underprivileged children, be the same one who finds himself involved in an illicit drug ring? How is the man who funds holiday meal giveaways for the elderly, be the very same one found to be in possession of a large volume of methamphetamine? How is a man described by family and friends as compassionate, committed to his faith and dedicated to his children, be the same one who allowed himself to stray to the other side of the law? (*See letters from family and friends*) What causes someone who, at the age of six, faces a genuine brush with death, to become someone who later finds himself among a group whose activities risk leading of life merely existing, rather than truly living?

Robin Douglass, Senior Lecturer at King's College in London, addresses how such a such a dichotomy exists within human beings by positing that:

> *[h]umans are complex creatures capable of both good <u>and</u> evil. To come down unequivocally on one side of this debate might seem rather naïve, the mark of someone who has failed to grasp the messy reality of the human condition. IAI, Issue 72, March 19, 2019.*

Judge Keesler seems to have grasped the messy reality within the human condition. Maurice Burris is neither all good, nor all bad, though he is entirely accountable for where he sits today. Mr. Burris makes no excuses for his behavior in this case. A close look into Mr. Burris' life journey, provides meaningful insight into who he is. His journey is one chock full of examples reflecting the ever present messy reality of the human condition.

Maurice Burris was born in York County, South Carolina in the summer of 1987, and was the third and youngest child of Ms. Tony Brown and Mr. Michael Burris. Ms. Brown will allocute to the Court during sentencing that by the time Maurice arrived, the impact of drug addiction, poverty and homelessness had already made its imprint on the Burris family. By the time Maurice arrived that August, his father was back in custody on drug charges leaving his mother to provide for more children with less help. With three children under the age of four years, Tony Brown relied heavily upon her mother, Corene Adams and Michael Burris' mother, Mary Smith, for the care and keeping of her three toddlers. Determined and focused, Tony Adams vowed to provide a life for her children that centered around faith and education. Ms. Adams worked a wide range of hourly wage jobs, often juggling multiple jobs, to provide for her family. She credits her children's grandmothers for being the "village" that we've come to agree, is necessary in the raising of our children.

Michael Burris and Tony Brown will convey to the Court during sentencing that the two were aware that their relationship was an imperfect, arguably toxic, bond. But that like many couples who share children in common, they aspired to raise their family together. Although sharing the same home often proved too difficult for Tony Brown, the urgings of her own mother and those of Michael's mother echoed in her mind ~ "Children need their fathers, work to ensure

that Michael Burris be allowed to be present in his children's lives". In response to the collective maternal urgings of the grandmothers, Tony Brown allowed Michael Burris to remain in the lives of his children. Despite his drug addiction, short temper and general unpredictability, Tony Brown believed that an imperfect father was better than no father at all. Maurice Burris' parents will allocute to the Court at sentencing that shortly after Maurice turned 3, Michael Burris begged Tony Adams to allow him to watch Maurice for the afternoon, allowing his own mother a respite from caring for their toddler and as a chance to prove he was not only capable, but worthy of caring for his young son. Tony Brown put three-year-old Maurice in his father's care only to return a few hours later to find both her toddler and his father, gone. It's believed that addiction-related psychosis triggered Michael Burris to vanish with three-year-old Maurice and although the two thankfully returned 6 days later, Michael Burris had no memory of where he had taken his son or what transpired while they went missing. Tony Brown will attest that her prayers were answered the day her toddler was returned to her, alive.

Before Maurice Burris turned 6, Michael Burris had already served various periods of incarceration leaving Maurice with few and spotty memories of his father, most of which centered around conflict between his struggling parents. Though life wasn't easy, Maurice had the love and support of his mother and of his grandparents. By all accounts, until age six, both of his parents will attest that Maurice Burris was a normal, healthy child. That changed shortly after his sixth birthday.

In 1993, while playing in parking lot of their apartment complex, Maurice Burris was struck by a car estimated to be traveling up to 32 MPH. His little body was catapulted into the air, eventually landing on the concrete nearly forty feet away. He laid, unconscious, unresponsive, bleeding, broken and barely alive. He was raced to the hospital where a team described by Tony Brown, of "true miracle workers" managed to keep Maurice Burris alive. After a lengthy and painful recovery, Tony Brown, Michael Burris and sister, Teontra Brown, will attest that Maurice was never quite the same after suffering his traumatic brain injury. Although he regained his affable, loving demeanor, physically he lacked the boundless energy he once had. Emotionally, Tony Brown noticed that her son seemed to rely on others more, and his previous independent, eager- to- lead spirit gave way to someone who had a need to please others and was content to follow. Reports from his teachers after he initially returned to school advising that

Maurice required intensive remedial instruction, came as no surprise to Ms. Brown, as she will attest, her son's medical team warned that his cognitive recovery would be long and uncertain. She was advised that he would likely need to receive added, supportive instruction in school. What Tony Brown did not anticipate, however, is that the effects of her son's traumatic brain injury would persist, that the processing required for learning, especially when reading or writing were required, would remain at a permanent deficit for Maurice Burris. Tony Brown will allocute to the Court that Maurice Burris worked hard to stay positive and tried to remain hopeful, but that he continued to rely heavily on others as he navigated life as an adult and that reliance has contributed to his plight.

As stated at the outset, Maurice Burris makes no excuses for where he is today. Maurice Burris conveys to this Court that it is he who is responsible for deciding to allow others to influence his behavior and for deciding to let others make decisions for him. In his words "I own this".

He credits what transpired after his June 13, 2018 arrest for providing the clarity he experiences today. Mr. Burris will allocute to the Court that the isolation following his arrest has allowed the noise of life to quiet, permitting him to think, reflect and actually contemplate in a way that he never has previously. Despite the limitations he was left with after his traumatic brain injury, Judge Keesler's remarks about the dichotomy of his life have stayed with him and allowed him to recognize that when he felt his heart fill after feeding the elderly or donating to the poor, that it was then that he was living his life authentically. That departing from the man that he knows himself to be and the one his family and friends know him to be, is a false identity, one he vows to never masquerade as, again.

It appears that limited, meaningful foresight into his actions, contributed to Maurice Burris' departure. Coupled with periods of moderate substance abuse, joblessness and competing family priorities and obligations, Mr. Burris created a faulty, garden-variety rationale that allowed him to partake in criminal conduct. Pledging to himself that he would limit his involvement for a finite period of time, along with assurances from others that his activity was peripheral and undetectable, Mr. Burris compromised. This disclosure is conveyed to the Court candidly by Mr.

Burris, but with the acknowledgement and awareness that this perspective is merely the product of the kind of distortion and rationalization that lands oneself squarely where he is today.

## *SENTENCING FACTORS*

The sentencing factors are more than a "laundry list of discrete sentencing factors; it is, rather, a tapestry of factors, through which runs the thread of an overreaching principle" that the court must consider "the entire constellation of section 3553(a) factors, include the need to avoid unwarranted disparity." *United States v. Rodriguez*, 527 F.3d 221, 228 (1st Cir. 2008) (citations omitted). The tapestry of factors include: (1) the nature and circumstances of the offense and history and characteristics of the defendant; (2) the need for the sentence imposed; (3) and (4) the kinds of sentence available and the Guidelines' range; (5) any pertinent policy statement; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. 3553(a).

In the instant case, the Court should consider Mr. Burris' acts of supporting his family despite his struggle to graduate from high school, his long history of tirelessly supporting those most in need within his community, his prior employment, his acceptance of responsibility and entering an early plea of guilty in this investigation, his minor role in the drug organization, and his lack of danger to the public.

## MOTION FOR DEPARTURE

*The Nature and Circumstances of the Offense*

As recognized by some courts, consideration of the role of the defendant is often overshadowed by the emphasis the Guidelines place on drug quantity. *See*, e.g., United States v. Milne, 384 F.Supp.2d 1309, 1312 (E.D. Wis. 2005) ("With their almost singular focus on loss amount, the guidelines sometimes are insufficiently sensitive to personal culpability"); United States v. Ennis, 468 F.Supp.2d 228, 230 (D. Mass. 2006) ("And since the Guideline drafters did not bother to describe the reason for making quantity talismanic, the sentencing purposes advanced by the quantity guideline, § 2D1.1, or what to do when quantity-driven sentences are wholly at odds with any rational sentencing scheme, judges were left 'just to weigh drugs and mechanically compute the offense level.'"); United States v. Adelson, 441 F.Supp.2d 506, 509 (D.N.Y. 2006)("As many have noted, the Sentencing Guidelines, because of their arithmetic approach and also in an effort to appear 'objective,' tend to place great weight on putatively measurable quantities such as the weight of drugs in narcotics cases . . . without, however, ever explaining why it is appropriate to accord such huge weight to such factors."). What is, in Mr. Burris' case, the Guidelines' undue emphasis on drug quantity, is reason to limit the weight given the Guidelines and a basis for consideration in sentencing of his limited role. Arguably, Mr. Burris may be entitled to an adjustment under the Sentencing Guidelines pursuant to U.S.S.G. § 3B1.2 as "a minor participant." The district court judge in United States v. Sanchez,

925 F. Supp. 1004, 1013-1014 (D. NY 1996), found the defendant, who was a "facilitator" in a conspiracy involving 212 kilograms of cocaine, to be entitled to the two-level reduction that is extended to a "minor participant":

> There are many roles in a conspiracy. A typical conspiracy involves a supplier, a courier, a middleman and a buyer. If his role must be typed, Sanchez must be classified as a middleman. His role was to bring together the buyer and the seller. For his efforts, he was to receive a fee of $ 500 per kilogram. The Court must then focus on the typical offender convicted on conspiracy.
>
> The most culpable conspirator is usually the supplier, the conspirator who controls large quantities of drugs. The courier also ranks high on the culpability scale because he or she carries drugs from place to place and often uses weapons or other elements of violence. The next most culpable must be the buyer as he or she distributes quantities of drugs to other dealers, thereby becoming a retail level supplier. In my view, the least culpable is the facilitator (or those who assist the deal by acting as driver or lookout). As a facilitator, Sanchez is by definition, less culpable than the typical offender convicted of conspiracy to distribute drugs.

Maurice Burris lacks the cognitive complexity to play a role greater than a "minor participant". Simply put, his mental limitations permit his role to be likewise, limited. On June 13, 2018 after arresting Mr. Burris, law enforcement documented that Maurice Burris was alone in a vehicle and that no one else was found to be occupying the home on Cane Field Drive. However, investigators surveilled Mr. Burris' address over an extended period of time and had become well-aware that the residence was occupied by others, in addition to Mr. Burris. More importantly, investigators were aware of the extent of the activity in which those who, though not present on June 13th, otherwise resided there, were engaged in. Specifically, investigators appear to have been aware that Mr. Burris functioned as a facilitator and did not play a major, leadership role in the enterprise. Investigative reports reflect no evidence that law enforcement rejected Mr. Burris' claim that he had no knowledge of what was contained within the blue

tablets found in the vehicle or that investigators suspected that Mr. Burris was bluffing or deflecting when he was questioned about the substances.

It is for the Court to determine whether Mr. Burris qualifies for the downward departure, however his limited participation in the offense is one of the "circumstances of the offense" that the Court is obligated to consider pursuant to 18 U.S.C. § 3553(a)(1). That obligation stands, irrespective of the Guidelines calculations:

> Judges may not simply assume that § 2D1.1 advances the purposes of sentencing spelled out in 18 U.S.C. § 3553(a). Whether it does do so or not depends upon the circumstances of the individual case. Moreover, the failure to consider those circumstances is not simply unfair; it may well be unconstitutional.
> United States v. Ennis, 468 F. Supp. 2d at 230.

*The Criminal History*

The application of Criminal History Category VI overstates the severity of Mr. Burris' criminal history, warranting a downward departure. As the Court is well-aware, the Guidelines are advisory, not mandatory. United States v. Booker, 543 U.S. 220 (2005). Even after Booker, the process of sentencing begins with an understanding of the applicable Guideline range. United States v. Feemster, 483 F.3d 583, 588 (8th Cir. 2007). The parties here did not calculate Mr. Burris' guideline range in the plea agreement and the United States Government represented to defense counsel that it took no position on whether Mr. Burris qualified as a "career offender". As a result, the plea agreement expressly specifies that the determination of whether Mr. Burris is deemed a "career offender" will be made by the Court (*See Plea Agreement, Page 3,¶ (f)* ). The pre-sentence report assigns Mr. Burris a total offense level of 35, and a corresponding sentence range of 292-365 months. This guideline range assumes that Mr. Burris is

appropriately assigned a Criminal History Category of VI due to classifying him under career offender status, although his criminal history points calculate to 8 which without the alleged career criminal enhancement, would otherwise equate to a criminal history category of IV.

In order to provide a more detailed context for these entries in Mr. Burris' criminal history report, it is important to understand that these entries reflect a period of about 28 months, when Mr. Burris was between the ages of 19 and 21 years, and in the midst of active drug addiction. During these 28 months he was charged with possessing drugs; twice for possessing cocaine (Crack) and once for possessing marijuana. Mr. Burris was given a probationary sentence in two of the matters and served an active sentence of 36 months after pleading to an enhanced charge of Possession/Distribution of Cocaine Base within proximity of a public park. Because these charges came at a time when Mr. Burris was admittedly actively abusing and addicted to cocaine, the history underrepresents Mr. Burris' affliction and overrepresents his actual propensity for criminal enterprise.

Pursuant to U.S.S.G. § 4A1.3(b)(1), a downward departure may be warranted where a defendant's criminal history category over-represents the seriousness of the defendant's criminal history. State v. Bradford, 500 F.3d (8th Cir. 2007); United States v. Payne, 81 F.3d 759 (8th Cir. 1996). The United States Sentencing Commission has recognized that the use of criminal history points to calculate sentencing ranges can lead to disparate treatment of offenders for which there is no rationale or justification. See Comments to USSG § 4A1.3. This result can occur because a defendant's criminal history invariably relies on the degree of leniency or harshness received by the criminal justice system in the past. United States v. Maloney, 466 F.3d 663, 670 (8th Cir.)

After applying the factors set forth in Title 18, United States Code, Section 3553, and for the following reasons Mr. Burris should receive a sentence below the advisory guideline range: 1) Mr. Burris should receive a Departure from the Guideline range for the reasons stated above; 2) a Variance from the Guideline range is warranted if a Departure is not. A sentence of less than the advisory guideline range, is "sufficient but not greater than necessary to comply with the purposes of sentencing." 18 U.S.C. 3553(a); See *Kimbrough v. United States*, 522 U.S. 85 (2007); *Gall v. United States*, 552 U.S. 38 (2007); *United States v. Booker*, 543 U.S. 220 (2005).

For the foregoing reasons, we respectfully request that the Court Depart and/or Vary from the advisory guideline sentence.

Respectfully submitted, this the 13th day of January, 2020.

s/KATHLEEN C. CLARY
NC Bar # 39248
Attorney for the Defendant
Rawls, Scheer, Clary & Mingo, PLLC
1011 East Morehead Street, Suite 300
Charlotte, North Carolina 28204
704-376-3200 (office)
704-332-2716 (fax)
@rscmlaw.com

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that he has, this day, served a copy of the attached Motion on the parties listed below by ECF Notification system at the email address listed below.

**Sanjeev Bhasker**
Assistant United States Attorney
227 West Trade Street
Suite 1650
Charlotte, North Carolina 28202
Sanjeev.bhasker@usdoj.gov

Respectfully submitted, this the 13th day of January 2020.

s/KATHLEEN C. CLARY
NC Bar # 39248
Attorney for the Defendant
Rawls, Scheer, Clary & Mingo, PLLC
1011 East Morehead Street, Suite 300
Charlotte, North Carolina 28204
704-376-3200 (office)
704-332-2716 (fax)
kclary@rscmlaw.com

April Burris-Chisholm

7868 Roxboro Rd.

North Charleston, SC 29418


To whom it may concern:

It gives me immense pleasure to write on behalf of Maurice Burris. Maurice is my first cousin, but being close in age; we were raised like siblings. He has consistently proven himself to be a loyal and steadfast individual in both his personal and professional life. Having known Maurice forever, I can honestly say that he is a person who leads by example. Both his coworkers and his loved ones look up to Maurice and are inspired by his work ethic and dedication.

In both professional and personal realms, Maurice is a leader. He is able to communicate with people both younger and older than him and to be positive and friendly. There is no project or task that he cannot complete. Maurice is the definition of a go-getter. In general, Mr. Burris, owner of Instant Clean Pressure Washing, LLC, is known for being a devoted and reliable friend and community member.

Mr. Burris expressed to me the serious lack of judgment that he exhibited and expressed both remorse and a strong desire to address the personal issues at the heart of the matter. As a friend and family member, I have been aware of some delicate difficulties in Maurice's personal life. The death of his best friend overwhelmed him and severely compromised his ability to cope properly with life. I believe Mr. Burris has every intention of improving since. Maurice has always been a strong personality with the desire for self-improvement. Regardless of the challenges that he may face, I have confidence that Maurice has developed the new skills needed to avoid making poor decisions.

I have no doubt that Maurice possesses the ability to continue to be a solid upstanding figure in this community. Mr. Burris has thus far shown a committed and resolute demeanor in moving past this mistake in a constructive and successful manner. It is my hope that this letter regarding Maurice Burris will act as a positive and contributing factor when the court considers this matter.

Sincerely,

*April Burris-Chisholm, MA, CCC-SLP*

April Burris-Chisholm, M.A., CCC-SLP

Speech-Language Pathologist

Carolina Therapy Services

Dear Ms. Katy,

This is OCTAVIUS BArnette, the reason for writing this letter is to explain how honorable Mr. Burris is. I've know Mr. Burris my whole life, in the time knowing him i've know him to be a God fearing man. The reason I metion this is because we have attended the same church our entire life, which is Langrum Branch Baptist Church which is in York, SC. Mr. Burris family is a God fearing family that's very close knit. Over the years I've known Mr Burris to work with the

youth in the community, doing whatever it takes to make sure they were happy. Mr Burris is a family man also, one that younger fathers should look up to. Mr Burris is a great guy we should have more guys like Mr. Burris. Everytime we encountered he always had a smile on his face and was willing to help with everthing. I have never had a bad moment with Mr Burris our entire life. In conclusion Mr. Burris could be considered as one of the World Greastest Dads.
    Thank Octavius

August 8, 2019

Dear Ms. Clary,

Hi, my name is Jacqueline B Burris and I am writing this for for Maurice Burris.

I had know Maurice for quite sometime. He is a member of the Langum Branch Baptist Church where I attend and usually he takes our pictures when we all have special events. Maurice is some what a quiet person but he has always been mannerly and shows a lot of love for family. Just as we go thru life sometimes we lose control of the path that God leads us to. We become very rebellious and let us to do things that aren't pleasing in sits. Maurice is caring and knows right from wrong but just got caught in the wrong thing, but I do believe that God has a plan for him. I just hope the Court would be lenient on him.

Thanks
Jacqueline B Burris

Hello Katy Clary, This is Michael Burris. Maurice Burris father. I am writing to let some one know about Maurice. First of all when Maurice was a baby he live through my addiction. I would put him in the car with me an be gone for days. I would leve them for days in my addiction. When Maurice got hit by the car he woke up an the only thing he said was Daddy don't leave me no more, But through my addiction i left him again and again until i did not come back, he was just 13 years old. I allowed my addiction to take me out of Maurice life. When God Reach down in grab me Maurice was the first one to come to me an said Dad i want to be strong like you. That was about 2015, Maurice have been trying to get his life together an i know God is working with him because he just can't stop helping people. That's how things was happening with me i was helping people in prison in when i got out God had taking my addiction from me. I remember they needed some one to take pictures at church in one of the elderly lady's ask me to ask Maurice will he take pictures for them, Maurice said yes, Maurice took the pictures an when he

came back to church he had gotten all the pictures developed an did't charge them anything. The church did't have the money to pay for the pictures they said and that's why they was so thankful for Maurice.
I know Maurice is not a Angel an he have done some things not Right, But Maurice is a good young man, He take care of his kids he take care of his grandparents an he was working everyday. I would like to tell you that he also help out with other young boys in the family talking to them about make good decision in life. Who better to talk to them other than some one who have made mistake's in life. I am not trying to tell you Maurice did't do wrong I am asking you to please give him a chance to get it right God gave me another chance in u have been preaching and have a out reach ministry - The Tribe of Judah - We work with young ladys and young man we feed the community an give back, Maurice have been a big part of that, him an his two sons. Please Don't take his life

Reverend Burris

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | **SENTENCING MEMORANDUM** |
| | ) | |
| vs. | ) | |
| | ) | |
| | ) | Docket No.: 3:19 CR 0041-MOC |
| MAURICE BURRIS, | ) | |
| Defendant. | ) | |

## *INTRODUCTION*

Magistrate Judge David Keesler acknowledged the dichotomy within Maurice Burris on April 30, 2019, when he remarked, that Mr. Burris is a man whose life and actions have straddled two extremes after listening to the recitations from both the government and defense counsel at Mr. Burris' release hearing. Judge Keesler's observation was a keen one, but one that begs the question how could the man who sponsors charity bicycle giveaways for underprivileged children, be the same one who finds himself involved in an illicit drug ring? How is the man who funds holiday meal giveaways for the elderly, be the very same one found to be in possession of a large volume of methamphetamine? How is a man described by family and friends as compassionate, committed to his faith and dedicated to his children, be the same one who allowed himself to stray to the other side of the law? (*See letters from family and friends*) What causes someone who, at the age of six, faces a genuine brush with death, to become someone who later finds himself among a group whose activities risk leading of life merely existing, rather than truly living?

Robin Douglass, Senior Lecturer at King's College in London, addresses how such a such a dichotomy exists within human beings by positing that: